# EXHIBIT G

June 22, 2020

Chairman Benjamin Hovland
U.S. Election Assistance Commission
1335 East West Highway, Suite 4300
Silver Spring, Maryland 20910
Attn: Testing & Certification

**Submitted electronically**

RE:  Proposed Voluntary Voting System Guidelines 2.0 Requirements
     85 Fed. Reg 16621 (Mar. 24, 2020)
     EAC-2020-0002

Dear Chairman Hovland:

We write to comment on the Proposed Voluntary Voting System Guidelines 2.0 Requirements (VVSG 2.0). Free Speech for People is a national, non-profit, non-partisan organization that works to fight for free and fair elections in a democratic process in which all people have an equal voice and an equal vote.

Two of the primary responsibilities the U.S. Election Assistance Commission (EAC) was charged with at its inception are    the development of the VVSG and certifying voting systems to those standards. In 2016, when U.S. intelligence agencies warned us that the foreign adversaries were targeting our election infrastructure with cyber attacks, the EAC's charge to develop voting system standards and certify our election systems took on unprecedented importance. The EAC is responsible for creating guidelines for the mission-critical operation which underpins the legitimacy of our self-governing democracy. Indeed, in appearances before Congress the EAC Commissioners have frequently defended the EAC's relevance by highlighting these duties. Their importance to our national security cannot be overstated.

We appreciate the care and diligence that went into the development of the VVSG 2.0.  The proposed VVSG 2.0 will compel much improved security, accessibility and auditability in voting system technology compared to the systems the EAC is currently certifying.  <u>We specifically wish to express our support for the provisions that address auditability, interoperability, software independence, ballot secrecy and that ban internet connectivity</u>. These fundamental requirements

are unacceptably absent in too many voting systems currently in use, and their inclusion in the federal guidelines is long overdue. To further strengthen the draft VVSG 2.0, we offer comments line by line, with recommendations. We strongly support the passage of the VVSG 2.0 with appropriate improvements and its swift adoption.

We also wish to address a severe deficiency in the current VVSG and the EAC's testing and certification program. At present, vendors can continue to certify voting systems under the profoundly outdated 2005 VVSG 1.0. Vendors have abused this failing of the EAC's program by making substantial changes to existing systems - including introducing entirely new devices and hardware or changing the operating system -while implausibly claiming the new configuration represents a mere "modification."

Congress has raised this as an issue of concern to the EAC in Congressional oversight hearings. At a May 2019 hearing of the Senate Rules Committee, Senator Angus King (ME) questioned then-Chair McCormick about the EAC's practice of certifying voting systems to standards that are well over a decade old.[1] Chair McCormick agreed this was a problem but claimed the reason is because no vendor had brought in a system to be certified to the more stringent VVSG 1.1 adopted in 2015. This response misleadingly omits the fact that <u>the EAC has the authority to determine what can be certified to the VVSG 1.1 and what must be certified as a new system under VVSG 1.1. Moreover, the EAC has authority to sunset the VVSG 1.0 entirely</u>. Ms. McCormick told Senator King that the EAC "is trying to remedy that."[2] Yet, in the last few months the EAC has accepted three system "modifications" that will be certified to VVSG 1.0.[3]

As it stands, the proposed VVSG 2.0 Requirements do not illuminate the distinction between modifications and new systems. The current version of the Testing and Certification Program Manual allows manufacturers to perpetually certify systems under obsolete requirements as long as those systems are considered "modifications."[4] However, its definition of modification is overly inclusive. Testing Manual 1.16 defines a modification as "any change to a

---

[1] *Available at*: https://www.govinfo.gov/content/pkg/CHRG-116shrg36452/pdf/CHRG-116shrg36452.pdf

[2] *Ibid.*

[3] https://www.eac.gov/voting-equipment/voting-systems-under-test

[4] EAC, *Testing and Certification Program Manual*, § 4.6.2.3, (2015), https://www.eac.gov/sites/default/files/eac_assets/1/6/Cert_Manual_7_8_15_FINAL.pdf (laying out the requirements for testing voting system modifications).

2

previously EAC-certified voting system's hardware, software, or firmware that is not classified as a de minimis change order."[5]

This definition allows manufacturers to gain federal approval based on obsolete requirements simply by updating pieces of a system over time under the guise of modifications. It fails to clarify the point at which a modification is so significant that it becomes a new system, which is merely a system "not previously certified."[6] Under current policy, manufacturers determine what counts as a new system based on internal criteria.[7] This is unacceptable and clearly within the EAC's authority to remedy immediately.

The world of technology has changed significantly since 2005, when VVSG 1.0 was established: the iPhone had not yet been released, and movies were rented in DVDs. We are concerned that allowing earlier VVSGs to remain available will permit manufacturers to obtain certifications in conformity with 2005 standards, which do not reflect modern expectations of a voting machine (or indeed any computer) with respect to usability, reliability, and security.

Therefore, we urge the EAC to include a provision clearly outlining the difference between a "new system" and a "modification" and that the EAC, not the voting system vendor, establish if a system presented for certification constitutes a modification or a new system. We further request the addition of a provision that definitively sunsets VVSG 1.0 and 1.1.

**Specific Line Comments to the VVSG 2.0 draft**
(Recommended changes or additions to text are underlined.)

**Lines 172 -186** - Represents a reasonable and balanced approach to providing accessible voting technology for all voters in accordance with the Help America Vote Act of 2002 and the Americans with Disabilities Act and we concur with this section. However, we believe it could be improved with two small changes.

---

[5] *Id.* § 1.16

[6] *Id.* § 4.3.

[7] EAC, *NOC 17-01: New System Designation*, 2 (2017), https://www.eac.gov/sites/default/files/eac_assets/1/6/NOC_17.01_NewSystem%28FINAL%297.18.17.pdf, ("The EAC has determined that the most efficient way to determine the criteria for a 'new' system is to let manufacturers use their current criteria for configuration management to establish when a system is 'new.'")

First, at the end of line 182, by deleting "particularly." Certainly, if a ballot marking device produces ballots or printouts that visibly differ from those used by voters who hand-mark paper ballots, then a sufficient number must be produced by the ballot marking device to protect the secrecy of individual voters' ballots. But if a polling place uses a ballot marking device that prints ballots that are visually identical to those used by voters marking their ballots by hand, then there is no need to require a certain number of voters who may not want to use the marking device to nonetheless use it to ensure privacy for others.

Second, by adding in line 184, "Issues of ballot secrecy can be substantially ameliorated by adopting ballot marking devices that produce a marked paper ballot identical in format and size to pre-printed paper ballots."

**Lines 188-89 -** Recommend delete: "and *may not be sufficient to provide equal access as required by law.*" This contradicts the conclusion provided in Line 176 and 177. Furthermore, the EAC has not supplied a legal analysis in support of this assertion.

**Line 193-195** - Recommend delete. This is out of scope for the VVSG.

**Lines 224-241 (Regarding a ban on Internet connectivity in voting systems)** – We strongly support this section and vigorously oppose comments asking to strike it. We are compelled to point out that the EAC Commissioners have frequently made public statements that erroneously claimed that the EAC's current certification program prohibits internet connectivity when assuring the public of the security of election systems.[8] Furthermore, when questioned by Congress on this point then EAC Chair McCormick erroneously testified to the Senate Rules Committee that the EAC's VVSG *do* ban internet connectivity.[9] This evinces how vital a ban internet connectivity is to both the actual and perceived security of U.S. election systems. Failing to include a clear prohibition on internet connectivity will needlessly invite security risks to our elections and erode public and Congressional confidence in the EAC's certification program and in our election infrastructure.

**Line 297 -** Recommend delete all. Recording vote choices in barcodes creates a non-verifiable record of votes used for counting. Even if the vote choices are also

---

[8] McCormick, Hicks, Masterson, "Don't believe the hype. Foreign hackers will not determine the next president." *The Washington Post,* October 18, 2016. *Available at:* https://www.washingtonpost.com/opinions/dont-believe-the-hype-foreign-hackers-will-not-choose-the-next-president/2016/10/18/a2a89b2c-94b1-11e6-9b7c-57290af48a49_story.html

[9] *See supra*: note 1.

4

recorded in human readable text, the scanners are counting a record that was not verified by the voter.  Even if the election results are robustly audited, studies have shown the voters do not adequately verify the vote selections to provide a reliable audit record. Ballots produced by ballot marking devices should be designed to produce ballots that are identical in format to pre-printed ballots.

**Line 672** -Recommend delete all. *See above.*

**Lines 974-974** -Recommended addition: "Logic and accuracy testing functions shall not rely upon any test data stored within the device or subsequently installed electronically into the voting device such as a test pattern. "Test functions*"* must introduce no lasting effects on operation during the election other than…"

This addition is recommended to prevent "auto test" features promoted by vendors which are insufficient and failed to detect programming errors that resulted in incorrect election results in the November 2019 election in Northampton, Pennsylvania.[10]

**Line 1040** -Recommended Addition: "1.1.2-R Systems that send test ballots over a public network must provide a report of test ballots that…"

As no actual ballots should be sent over a public network, this needs to clearly specify it is *only* referring to *test* ballots.

**Line 1134** -Recommended Addition: "An electronic ballot marker may only record contest selections on a paper ballot sheet and may not record, store or export electronic copies of any contest selection*."*
Electronic ballot markers should not be capable of electronically recording votes; systems which record votes electronically should be classified as Direct Record Electronic.

**Lines 1206 -1212** - Recommend delete all.
Recallable ballots within voting technology will require linking the voter's identity with the cast ballot, inherently violating ballot secrecy provisions, not only in the VVSG, but which are codified into law in all fifty States. Therefore, no machine-read ballots should be recallable. Provisional ballots where eligibility has not been

---

[10] Nick Coransiniti, "A Pennsylvania County's Election Day Nightmare Underscores Voting Machine Concerns," *The New York Times,* November 30, 2019. *Available at:*
https://www.nytimes.com/2019/11/30/us/politics/pennsylvania-voting-machines.html

determined should be handled in a traditional paper fashion which permit the voted ballot to be adjudicated with no violation of ballot secrecy.

This issue was debated at length by the members of the TGDC who carefully and thoughtfully wanted to balance the need to protect the secrecy of the ballot with sensitivity to the few States with recallable ballot provisions. **The discussion, which was led by State election directors, concluded that ballot secrecy was too important to allow the practices of a few States to corrode a strong standard protecting ballot secrecy in the VVSG 2.0.** The members decided that States may wish to consider abandoning the provision for recallable ballots or develop their own certification to workaround the federal VVSG if they wish to use recallable ballots. This discussion can be viewed here: https://www.eac.gov/videos/tgdc-meeting-091217-part-1 at minute 36.

**Line 3313** - Recommend delete: "ballots and." Vote selections should not be recorded in barcodes.

**Line 3316** - Recommend delete: "ballots or other." *See above.*

**Lines 3318-40** - Recommend delete all. Vote selections should not be encoded in non-human readable form for scanning and counting.

**Lines 1479- 1491** - Recommend delete all. *See Line 1206.*

**Line 1550** - Recommend add: "If ballots are processed in a central-count operation by batch, the election system must have capability to create a report of the totals of the votes in the contests included in each batch, such that it can be prepared prior to any random draw of a batch-comparison audit."
This will facilitate certain methods of post-election audits.

**Line 1611** - Recommend delete all. See explanation for Line 1206.

**Line 1663** - Recommend delete all. See explanation for Line 1206.

**Lines 2312** - Recommend add: *"Voting systems must also not have "back doors" such as bootable USB Drives where an attacker might insert a drive and take over the voting system."*

**Line 2826** - Recommended add: "Expected values for confirmed digital signatures of procured software components should be attached to the declaration."

A declaration from the manufacturer that software items were obtained directly from the manufacturer or distributor is insufficient. The digital signature and its expected value should be included.

**Line 2845 -** Recommended change: Change "tabulation" to "process rate."

**Line 2848** - Recommended add: "<u>The maximum voting rate for electronic ballot markers (BMD) must be documented to include setup time between voters, time for an average voter to mark a ballot of specified complexity, and the time necessary for an average voter to verify the resulting selections if that must be completed before leaving the BMD.</u>"

**Lines 4098-4099** - Recommended change: "<u>~~The voting system~~ An electronic ballot marker must be capable of printing paper ballots and other paper records with a minimum font size of 5 mm (14 points). Font and layout on paper should support potential use of optical character recognition on ballot images for use as an alternative means of tabulation or supplemental audit review</u>."
Many ballot marking devices print ballot summary cards with a font size too small for voters to read and verify.

**Line 5188** - Recommended addition: "<u>In particular, they must report the rate at which voters detect and report discrepancies with BMD printed ballots purposely misprinted during the usability test</u>."
News reports indicate voters have found errors in the printed ballot summary produced by a BMD.[11] It's essential to also track such errors in usability tests.

**Lines 5431-3 -** Recommend delete all. *See Line 3313.*

**Lines 5443 and 5444** - Recommended change: "Each paper ballot that is counted may contain a unique identifier <u>not seen by the voter or anyone in the presence of the voter</u> that which can be printed on the ballot <u>after casting</u>."
The unique ballot identifier generated to facilitate audits should not be known to the voter, or anyone.

**Line 5810** - Recommended change: "<u>No systems may use indirect voter associations.</u>"

---

[11] Will Peebles, "How Covid-19 wreaked havoc on Georgia, Chatham County elections process," *Savannah Morning News,* June 12, 2020. *Available at:*
*https://www.savannahnow.com/news/20200612/how-covid-19-wreaked-havoc-on-georgia-chatham-county-elections-process*

Indirect associations in any context or system directly violate the principle of ballot secrecy. Creating a database of voter's identities and ballot selections violates voter's entitlement to a secret ballot.

**Lines 5823-5855** - Recommend delete all. See above.

**Line 6916** - Recommended addition: "<u>and should not contain hardware and software capable of establishing a wireless connection</u>."
Voting system vendors have marketed voting systems that contain wireless radios to customers that do not want to use them with the reasoning that they can be disabled. Disabling is insufficient. In order to ensure the system is not "capable of establishing wireless connections" as 14.2-D requires, the system must also not include elements with that capacity.

**Lines 6928-2936** - Recommend delete all. This conflicts with 14.2.D which prohibits wireless connections.

**Line 7097** - Recommended change: "<u>every</u> component in the system."
The Bill of Materials must not be limited to critical components as non-critical components may factor into malfunctions or contain security vulnerabilities that impact the entire system.

**Line 7641 -** Recommend delete: "ballots,". *See Line 3313.*

Thank you for the opportunity to submit comments on the VVSG 2.0. We wish to stress that our primary recommendation is to move swiftly to adopt and implement updated standards and to cease permitting voting system vendors to submit systems for certification under the 2005 VVSG. This should be considered urgent and principally important by the EAC. We urge you to pass and adopt the new VVSG 2.0 with appropriate improvements as soon as possible.

Sincerely,

Susan Greenhalgh
Senior Advisor on Election Security
Free Speech For People